## JACOBSON v. HAHN et al.

District Court, N. D. New York.
Feb. 30, 1936.

Oliver D. Burden, U. S. Atty., of Syracuse, N. Y. (Donald P. Gorman, of Syracuse, N. Y., of counsel), for defendants.

Frank J. Wideman, Asst. Atty. Gen. (Andrew D. Sharpe, Frederic G. Rita, and Donald J. Marran, Sp. Assts. to Atty. Gen., of counsel), for defendants.

James M. Noonan, of Albany, N. Y., for plaintiff.

COOPER, District Judge.

This is a suit in equity brought by the plaintiff to recover certain Liberty bonds deposited by the plaintiff with the defendant Hahn, as clerk of the court, in lieu of bail for Arthur Flegenheimer, also called Dutch Schultz, a defendant in a criminal action in this court, and to cancel and declare void a certain alleged notice of tax lien and notice of levy filed by the defendant Higgins, as collector of internal revenue for the Third District of New York, against such Liberty bonds.

On February 20, 1935, the plaintiff, Jacobson, deposited with the defendant Hahn, as clerk of this court, under the provisions of U.S.C.A. title 6, § 15, certain Liberty bonds of the face value of $75,000 in lieu of bail for the said defendant Flegenheimer, who had been indicted in this district for violation of the income tax laws of the United States.

These bonds had been previously deposited by the plaintiff with the United States Commissioner at Albany, in this district in lieu of bail for the same Flegenheimer who had been indicted for the same offenses in the Southern District of New York, surrendered himself to this United States Commissioner at Albany and resisted removal to the Southern District.

While the removal proceedings were pending undetermined, the defendant Flegenheimer was indicted for the same offenses in this district. By agreement of counsel, the bonds were withdrawn as bail in the removal proceedings and redeposited in lieu of bail for the defendant Flegenheimer under the new indictment in this district.

At the time of the redeposit of the bonds under the indictment in this district, the plaintiff, Jacobson, made and filed his affidavit that he was the owner of said bonds and was authorized to deposit and pledge them in lieu of bail. Concurrently with the deposit under the indictment in this district, Jacobson also executed a recognizance as surety for the appearance of Flegenheimer to answer said indictment in this district.

The clerk thereupon gave plaintiff, Jacobson, a receipt reading as follows:

"Received from Joseph L. Jacobson as bail after indictment in the sum of $75,000 covering release of the above named defendant on an indictment filed in this court on February 14, 1935, in the above entitled case the following numbered liberty bonds ————."

On February 20, 1935, the defendant Higgins, as collector of internal revenue

for the Third New York District, filed with the clerk notices of lien and levy against the property of Flegenheimer in the sum of $113,933.72. The notice of levy contained this statement:

"This notice of levy is also intended to cover all liberty bonds submitted in the name of Joseph Jacobson as bail for Arthur Flegenheimer, alias Dutch Schultz."

Flegenheimer was tried and acquitted upon the indictment and discharged from custody on August 1, 1935.

On or about August 19, 1935, the plaintiff, Jacobson, demanded that the defendant Hahn turn over to him the said $75,000 in Liberty bonds, but the clerk refused to do so.

Jacobson thereupon brought a summary proceeding to obtain an order compelling the clerk to deliver the said bonds to him. Upon the hearing, government counsel representing the clerk and the collector raised the question that the court had no jurisdiction so to do in a summary proceeding and the court sustained the objection.

Question having been raised in such proceeding that the collector's notice of lien and levy had been filed without consent of the court, the court, on October 10, 1935, granted an order permitting the file as of February 20, 1935.

Thereupon the plaintiff brought this suit in equity for the return of the bonds and cancellation of the collector's lien and levy.

The defendant Flegenheimer was not served with process in this suit.

Upon the trial the plaintiff was not sworn as a witness. His counsel presented the clerk's receipt showing acknowledgment and the plaintiff's affidavit claiming the ownership of the bonds filed by the plaintiff with the bonds at the time of their deposit with the clerk, and rested.

The government's motion for decree awarding the bonds to the defendant collector was denied. The court held that the plaintiff had made a prima facie case and the burden was on the defendant to show that the plaintiff was not the owner of the bonds. Thereupon the defendant offered as evidence the statement of J. Richard Davis, attorney of record for Arthur Flegenheimer, taken before the United States Attorney for the Southern District. on November 29, 1935, which was stipulated by the counsel to be receivable as a deposition. Defendants also offered

the oral testimony of Louis Schneck and Isaac N. Jacobson. Defendant then rested.

The plaintiff offered no further evidence.

Briefs were to be submitted and the court intimated that Schneck and George Weinberg should be made parties and stated that if any party desired to offer additional evidence, they might do so.

The plaintiff elected to introduce the further evidence, which was taken on the 14th day of January, 1936, and consisted of the testimony of the said Louis Schneck, recalled as witness in behalf of the plaintiff and of George Weinberg, sworn for plaintiff.

According to the statement of Flegenheimer's original attorney, J. Richard Davis, Flegenheimer, who was then in the Albany county jail held in $75,000 bail and awaiting removal proceedings, told him to go to George Weinberg and Louis Schneck and get money to deposit. Weinberg gave Davis $40,000 in $1,000 or $500 bills and Schneck gave him $24,000 in $500 or $1,000 bills, making in all $64,000. He was thus $11,000 short of having the necessary $75,000 bail money.

It was suggested by one Alexander Cohen that Davis go to Isaac N. Jacobson as a good lawyer and one who could probably secure the balance of the bail money. Davis retained Jacobson and paid him a fee of $8,500 to $11,000, the exact amount being uncertain, out of the $64,000 received from Weinberg and Schneck, and which reduced that amount to $53,000 or $57,500.

Attorney Jacobson changed Davis' plan of depositing cash bail. He was never informed of the source of the $64,000, and apparently believing that it was Flegenheimer's money, did not want any money other than his fee to pass directly to him from Davis. He decided to have the money go from Davis to others and from others to himself and with the money to purchase and deposit Liberty bonds instead of cash.

Jacobson obtained a loan of $40,000 from one Henry Westheimer in this wise. Westheimer loaned attorney Jacobson $40,000 upon the collateral security of forty-one $1,000 bills delivered to Westheimer simultaneously by Davis. This $41,000 was taken from the moneys received by Davis from Weinberg and Schneck. Westheimer

promptly paid himself out of the collateral.

Attorney Jacobson also arranged to obtain $10,000 from one "Stitch" McCarthy in return for which Davis gave McCarthy a check for $10,000 out of the $64,000 received from Weinberg and Schneck.

Attorney Jacobson then obtained from his uncle, plaintiff, Jacobson, $25,000. The details of the amounts and the manner in which this was obtained are not important. He then had from

Westheimer, ....................$40,000
McCarthy, ....................... 10,000
Plaintiff Jacobson,............... 25,000

$75,000.

But he had to pay a premium of $3,003.21, including brokerage fees for $75,000 par value Liberty bonds. The $3,000 came out of the $64,000 received from Weinberg and Schneck and he gave the $3.21 in cash.

Attorney Jacobson, having purchased the bonds in his own name from Emanuel & Co. and having thus gathered the $78,003.21 in checks and some cash, gave plaintiff, Jacobson, an order on Emanuel & Co. to deliver the bonds to plaintiff, Jacobson, and gave plaintiff, Jacobson, the checks and money. Attorney Jacobson obtained the bonds under such order, went with Davis to Albany the same evening and deposited the bonds with the United States Commissioner as bail for Flegenheimer, who was released.

Concurrently with the delivery of the order for the bonds, plaintiff, Jacobson, delivered to attorney Jacobson his note for $78,003.21, the purchase price of the bonds, and the latter gave the plaintiff his note for $25,000 representing the amount contributed by attorney Jacobson to the bond purchasing fund.

There are some details of the somewhat complicated financial transactions which will be referred to later so far as material.

Upon these facts the respective parties each claim that decree should be made awarding the bonds to him.

The plaintiff contends:

(1) The bonds deposited by Jacobson with the clerk of the court could not lawfully be subjected to distraint for taxes assessed against Flegenheimer.

(2) The defendants have utterly failed to prove any facts from which this court could even infer that the bonds deposited by the plaintiff were the property of Flegenheimer or purchased with Flegenheimer's money.

The government counsel assert:

I. The tax here sought to be collected was duly assessed and the proceedings taken by the collector were in all respects in accordance with law.

II. The bonds on deposit with the clerk were, at the time the notices of lien and levy were filed and still are, the property of Flegenheimer and not the property of plaintiff.

To support his first contention, the plaintiff's argument seems to be predicated upon the assumption that plaintiff had the legal title to the bonds deposited by him.

Plaintiff asserts, "Of this there can be no question." Based upon that assumption, the plaintiff argues that the statutory distraint proceedings against property of a transferee for taxes assessable against the transferor were not followed here and that therefore the tax lien is void, and plaintiff's transferee is entitled to the return of the bonds.

It is clear that plaintiff assumes that Flegenheimer is the transferor who is liable for the tax and plaintiff is the transferee from Flegenheimer of property which is subject to distraint in the hands of the transferee for Flegenheimer's income taxes, but only if the statutory provisions for distraint against a transferee are followed. Revenue Act of 1926, § 280, 44 Stat. 61, see 26 U.S.C.A. § 311 note.

Otherwise there would be no point in relying upon statutes relating to distraint against the property in possession of a transferee (Jacobson) for taxes due from the transferor (Flegenheimer) unless the property, and legal title thereto had passed from the transferor (Flegenheimer) to the transferee (Jacobson). If the property never was transferred directly or indirectly from Flegenheimer to plaintiff, it is not subject to distraint for Flegenheimer's taxes in transferee proceedings or otherwise. Plaintiff's argument, therefore, seems equivalent to an admission that the moneys with which the bonds were purchased were Flegenheimer's moneys and that the bonds were purchased by an agent

of Flegenheimer and sold to plaintiff, by which sale the legal title to the bonds was transferred to plaintiff, Jacobson. Plaintiff doubtless intends to make no such admission and his inconsistency need not be taken too seriously.

This claimed sale is doubtless predicated upon the assumption that when plaintiff, Jacobson, gave his note to attorney Jacobson for the full purchase price of the bonds and received from the latter an order on the brokers to deliver the bonds to the plaintiff, a sale was consummated.

■ In equity the taking of plaintiff's note for the purchase price and the concurrent order on the brokers for the delivery of the bonds to the plaintiff was an idle ceremony without legal or equitable effect and cannot prevail over the undisputed facts that none of the purchase price save $3.21 belonged to attorney Jacobson. He could not as owner pass title by an order or otherwise to property in which he had legally and equitably no interest and no right of possession save as agent or bailee. Moreover, it does not appear that any such transfer was within the scope of his agency, but was rather a device of his own creation unknown to Flegenheimer, Schneck, or Weinberg at the time, though known to Davis and plaintiff.

■ There was no sale of the bonds to plaintiff and plaintiff never had title and ownership to the bonds as a whole, but held them rather as bailee or agent at least as to all except the $25,000 purchased with the money he contributed. And plaintiff's contention that the tax lien is invalid because transferee proceedings were not followed must fall.

Nor does plaintiff seriously rely upon such alleged invalidity of the lien for he concedes that that failure of the collector to follow statutory transferee proceedings would not militate against the establishment of the lien in a proper equity suit such as the instant suit.

The plaintiff says in the main brief at page 15:

"While compliance with the statutory provisions of section 311, 26 U.S.C.A., if assessments against transferees or taxpayer's property is a condition precedent to a statutory distraint, such compliance is not a condition precedent to maintenance of suit against the transferee to enforce the tax liability against the transferor.

Leighton v. U. S. (C.C.A.) 61 F.(2d) 530, affirmed 289 U.S. 506, 53 S.Ct. 719, 77 L.Ed. 1350.

"Thus it remains to be seen whether the defendants upon the trial of this action have proved facts sufficient to justify this Court in making a decree awarding the bonds to the defendant Higgins.

"In reaching this point, counsel will not question the sufficiency of the Government's pleadings but will pass to the main issue and show beyond question or doubt that the Government has failed to prove any facts from which this Court can find that bonds deposited by the plaintiff were the property of Flegenheimer or purchased with money belonging to Flegenheimer."

■ It may be said in this connection that whether the bonds were deposited by the defendant or a third party, they are conclusively presumed to belong to the defendant and may be applied in satisfaction of the requirements of bail and the fine imposed upon the defendant regardless of the claims of third persons and whatever the nature of these claims. United States v. Widen (D.C.) 38 F.(2d) 517; Bankers' Mortgage Company v. McComb (C.C.A.) 60 F.(2d) 218, 220.

While the conclusive presumption of ownership in the defendant falls after the requirements of bail and fine have been satisfied, it does not follow that plaintiff is entitled to the decree awarding the bonds to him merely because he has deposited the same.

■ U.S.C.A. title 6, § 15, under which these bonds were deposited in lieu of bail contains these provisions:

"Nothing contained herein shall affect the authority of courts over the security, where such bonds are taken as security in judicial proceedings, or the authority of any administrative officer of the United States to receive United States Bonds for security in cases authorized by existing laws."

This section would be meaningless if it did not permit the court to determine the rightful ownership of the bonds where contesting liens or claims are filed with the consent of the court against the bonds so deposited. This is clear from Bankers' Mortgage Company v. McComb, 60 F.(2d) 218 (C.C.A.10).

■ Upon the argument much stress was laid upon the claimed irregularity of the lien filed by the collector of the Third Collection District against the property of Flegenheimer on the ground that the latter was a resident not of the Third but of the Fourteenth Collection District. The indictment in this district under which Flegenheimer was tried and acquitted was urged as conclusive that Flegenheimer was a resident of the Fourteenth District and not of the Third District of which the defendant Higgins is collector. Such indictment is not conclusive as to the residence of Flegenheimer. Chantangco v. Abaroa, 218 U.S. 476, 31 S.Ct. 34, 54 L.Ed. 1116.

■ But the conclusive answer to the claim of insufficiency or invalidity of the lien filed by the collector of the Third District against Flegenheimer because he is claimed to ·be a resident of the Fourteenth District is found in 26 U.S.C.A. § 1613. This section provides that any collector may seize or sell any property, real or personal, or any right or interest therein, situated in any other collection district within the state in which such officer resides, notwithstanding the provision of section 3209 of the Revised Statutes (26 U.S.C.A. § 1541 (b).

It is clear, therefore, that the collector may file a lien against the property of the defendant Flegenheimer whether he resides in the Third or Fourteenth Collection Districts of the state of New York.

We come now to the chief question in the case, viz.: Whose was the money used to purchase the bonds?

The $40,000 provided by Weinberg and the $24,000 provided by Schneck may be viewed from three aspects:

(a) That these moneys were at all times the moneys of Flegenheimer.

(b) That Weinberg and Schneck loaned the money to Flegenheimer through his agent Davis.

(c) That Weinberg and Schneck gave the money to Davis as bailee merely to deposit as bail for Flegenheimer and then to be returned to them.

This last is plaintiff's claim. But, in addition, plaintiff was permitted over defendant's objections to show by the testimony of Weinberg and Schneck at the last hearing that they were both willing that plaintiff should receive all the bonds including any purchased with their money or in which they might have an interest, making a sort of legal or equitable assignment to plaintiff on the trial.

This is also inconsistent with the contention that legal title to the bonds was in plaintiff and is doubtless intended to cure any defect in plaintiff's legal title to the bonds or, as stated by plaintiff's counsel, to meet the court's previous suggestion that Weinberg and Schneck might be made parties.

That this $40,000 obtained from Weinberg and the $24,000 from Schneck was in reality the property of Flegenheimer may reasonably be inferred from the evidence. Neither could give any satisfactory explanation of the source from which they obtained the money.

Weinberg said he kept it in a tin box in a secret compartment in the floor of his flat. He also had a secret compartment in the flat which he occupied before he moved to his present place of residence and probably at or about the time he produced the money, but he was very hazy as to which apartment he lived in at the time he delivered the money to Davis. He testified that he always carried large sums around with him and had no bank account and no safe deposit box and no place from which he obtained the money except the little tin box in the secret compartment in the floor of his flat.

Schneck said that he took the money from a safe deposit box in both of the denominations of $50 and $100 each. It will be remembered that Schneck's $24,000 was in denominations of $500 and $1,000 each.

These two men procured this money the same or the next day after the request by Davis, Flegenheimer's attorney and agent. It is a more reasonable inference that they knew or were told where to go and get money belonging to Flegenheimer, left with them or with some one else, than it is to conclude that they actually kept such large sums of money of their own in a tin box concealed in the floor or elsewhere concealed. It is true that Schneck was first sworn as a witness for the defendant collector, but on this later hearing he was expressly made a witness for plaintiff and Weinberg was plaintiff's witness. Schneck was in any

event in the nature of an adverse party. He was extremely vague as to how, when, and where he obtained the money except that he won it on horse races in 1934.

Both were long-time friends of Flegenheimer. Schneck admitted that Flegenheimer did him a great favor some years ago.

The record of one and the business and associates of both are not such as to require one to believe that they would let devotion to truth militate too much against their own interests or that of their friends. Neither was supported by any other witness as to the source from which the money was obtained and there were apparently some witnesses available to prove that they had the money where they said they did, had that been the fact.

But be that as it may, and assuming that the $40,000 and $24,000 was their own money, the facts clearly warrant the conclusion that they gave the money to Davis for Flegenheimer to use for Flegenheimer's benefit. In short, a loan to Flegenheimer.

It is undisputed that they delivered the money to Davis, the attorney and agent of Flegenheimer, who had been instructed by the latter to go to them and get the money. Clearly Davis was Flegenheimer's agent. This would be true whether the agency arose from his services as attorney or otherwise. Here the agency was specific and definite.

It is true that both Schneck and Weinberg under cross-examination by the plaintiff said they advanced the money to Davis for bail and expected to get it back when the purposes of bail had been completed and Davis rather vaguely said the same thing. Davis thought he gave both of them some receipt so reciting. Neither produced any such receipt, if any ever existed. If any such receipt had been in existence, it would have been produced for all parties knew its importance.

Weinberg and Schneck both knew when they testified that the $40,000 and $24,000 was at stake. They knew also that Flegenheimer was no longer living and it may be assumed that they believed that there was probably little or no chance of recovering the money from his estate.

Weinberg said he expected plaintiff's attorney and Davis to get for him the money they delivered to Davis. Both knew, of course, that the government claimed the money under the tax lien against Flegenheimer. The testimony that the money was delivered to Davis for bail only and to be returned to them was after thought made to serve their own interests. That they knew Flegenheimer wanted to use it for his bail in no way militates against the view that they loaned the money to Flegenheimer. It was no less a loan because they knew for what purpose he intended to use it.

Moreover, Schneck admitted upon cross-examination that he loaned the money to the Dutchman, meaning Flegenheimer. Clearly if he loaned the money to Flegenheimer, he did not deliver it to Davis as bailee for bail purposes only.

The court is not obliged to accept the testimony of these witnesses in this respect when it is inconsistent with other testimony and reasonable inferences therefrom and is so plainly self-serving.

Davis' statement on the subject is vague and unconvincing and not free from the category of evidence seeking to serve the interest of himself and others.

The conclusion then is that Schneck and Weinberg loaned the money to Flegenheimer through his agent Davis with title passing to Flegenheimer and the money was therefore the property of Flegenheimer.

It was this money then obtained from Weinberg and Schneck, after being used in a circuitous "collateralization" of loans obtained thereunder and a certified check of "Stitch" McCarthy, that was the purchase price of the bonds and was all delivered to Isaac N. Jacobson, who used it, after taking something for his services, and the $25,000 of Joseph Jacobson, for purchase of these bonds.

As heretofore stated, the device of the plaintiff, Joseph Jacobson, in giving his note in the sum of $78,003.21 to Isaac N. Jacobson for the loan of the money which secured the bonds is valueless as a device to transfer title to the bonds. It follows, therefore, that all the bonds were purchased with the Flegenheimer money except so much of the purchase price as came from the plaintiff.

When we come to the matter of the contribution of Joseph Jacobson to the purchase of the bonds, it is reasonably

clear that it was his money drawn from savings banks. At least that is the oral testimony, and while the books were not presented and he was not sworn as a witness by either party, the burden of proof is that it was his money. He never knew Flegenheimer, so far as the evidence discloses, and never had any transactions with him nor with his agent, J. Richard Davis. He loaned the money at the request of his nephew, the attorney Isaac N. Jacobson, to buy the bonds for the purpose of depositing them as bail.

There seems no reason to believe that so far as this $25,000 is concerned, that it was ever the property of Flegenheimer. Jacobson loaned the money to his nephew, Isaac N. Jacobson. True, the latter was also an attorney for Flegenheimer, but it was well known and understood at the time that the loan was for the purchase of Liberty bonds to be deposited as bail for Flegenheimer in the name of the plaintiff.

There can be no doubt that plaintiff, Joseph Jacobson, relied upon his nephew, Isaac N. Jacobson, the attorney, to use the money for the purchase of bonds and knew that the bonds purchased therewith were to be deposited by him in his name and that he would secure their return when the purposes of bail had been satisfied. It would be unreasonable under the evidence in this case to conclude that he ever intended to loan money to Flegenheimer or to accept the latter's responsibility. True, he took the chance that Flegenheimer might not appear to answer the indictment, but that is vastly different from making any loan to Flegenheimer. There is such element of risk in all bail.

■ Plaintiff who advanced only $25,000 should have only bonds to that amount which have matured or been called, and if that is not sufficient, he should have out of the proceeds of the remainder only so much as will bring him a total of $25,000.

The bonds subject to the last-stated condition are awarded to the defendant collector under his lien to be enforced as the statute provides.

Decree may be entered in accordance herewith to be settled on notice if not agreed upon as to form.