**MIDLAND INSURANCE COMPANY,**
**Interpleading Plaintiff,**

v.

**Dr. Charles FRIEDGOOD, Eva Friedgood, Chase Manhattan Bank, N.A., John Joseph Sutter, Esq., the United States Internal Revenue Service, and Steven J. Massey, Esq., individually and as members of a partnership known as Austin & Dupont, Interpleaded Defendants.**

No. 77 Civ. 4621 (CHT).

United States District Court,
S.D. New York.

July 28, 1986.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Gerald T. Ford, Asst.

U.S. Atty., of counsel), for interpleaded defendant I.R.S.

Steven Legum, Mineola, N.Y., and Seymour Adelman, Cedarhurst, N.Y., for intervenor Harriet Larsen.

TENNEY, District Judge.

Harriet B. Larsen and the Internal Revenue Service ("IRS" or "Government") are the only parties still before the Court in this interpleader action.[1] Both Ms. Larsen and the IRS have asserted claims against the interpleaded fund, which consists of $145,000, plus interest. The sum in issue was deposited with the Midland Insurance Company ("Midland") in 1975 to secure a bail bond for Dr. Charles Friedgood, who had been indicted for the murder of his wife. In 1976, Dr. Friedgood was convicted of murder in the second degree and larceny in the second degree. After his conviction, the bond was exonerated and this action was commenced.

Ms. Larsen argues that she owned the money in question at the time that she transferred it and that she is therefore entitled to have the funds returned to her. The IRS, which has made a jeopardy assessment against Dr. Friedgood for unpaid federal income taxes, argues that the money belongs to Dr. Friedgood, and should therefore be paid to the Government.[2] The IRS contends that the money at issue was originally transferred to Ms. Larsen by Dr. Friedgood and that it still belonged to Dr. Friedgood when it was presented to Midland as collateral for the bail bond. The IRS also argues that the transfer of money to Ms. Larsen constituted a fraudulent conveyance under Section 276 of New York's Debtor and Creditor Law, so that the transfer can be set aside, and the money can be reached by Dr. Friedgood's creditors.

A bench trial of this matter was held on June 15, 1986. For the reasons set forth below, the Court finds that the money at issue here is Dr. Friedgood's property and it is therefore subject to the IRS's tax lien. Accordingly, the interpleaded fund is hereby awarded to the IRS.

### FINDINGS OF FACT

1. While married to Sophie Friedgood, Dr. Friedgood had a relationship with Ms. Larsen, a nurse whom he employed.[3] Dr. Friedgood fathered Ms. Larsen's two children, Henrik Larsen, born October 7, 1972, and Mette Larsen, born May 22, 1974. Pre-Trial Order ("PTO") 2.

2. Ms. Larsen is a Danish citizen, and in March 1975, she went back to Denmark with her children. PTO 3.

3. On June 18, 1975 Dr. Friedgood's wife, Sophie Friedgood, was found dead at the Friedgood's Long Island home. The police became suspicious of Dr. Friedgood when they learned that he had signed his wife's death certificate. PTO 4; Trial Transcript ("Tr.") 9.

4. On June 25, 1975, Dr. Friedgood purchased a one-way ticket to London, and boarded a British Airways flight at Kennedy Airport. After the plane had left the gate, it was recalled by the police, and Dr. Friedgood agreed to leave the plane. He carried a black satchel off the plane with him. Inside the satchel were bearer bonds with a total value of $600,000, jewelry valued at $37,000 and stock registered to Dr. Friedgood, in his own name and in his

---

1. Larsen initially asserted a claim to the interpleaded fund, but withdrew her claim in 1979. She subsequently reasserted her claim and requested permission to intervene in the action. Her request was granted. *See* Memorandum filed Sept. 27, 1984, 77 Civ. 4621 (CHT). The Committee to Free Dr. Charles Friedgood also asserted a claim to the interpleaded fund, but their claim was dismissed by summary judgment in 1984. *See* 577 F.Supp. 1407 (S.D.N.Y. 1984).

2. Under Section 6321 of the Internal Revenue Code, 26 U.S.C. § 6321, an assessment of federal tax liability creates a lien in favor of the United States upon all real and personal property, or rights to property, of the taxpayer, irrespective of whether the property is acquired before or after the assessment dates.

3. Incorporated in these findings are the undisputed facts set forth in the Pre-Trial Order, signed by the attorneys for Ms. Larsen and the IRS. *See* Pre-Trial Order, Agreed Facts.

corporate name, CEF Enterprises, Inc. PTO 5.

5. On July 3, 1975, Dr. Friedgood wrote a check for $50,000 on the corporate account of Smallwood Estates Corp. The check—number 254—was made payable to himself, and he sent it to Ms. Larsen in Denmark, where she cashed it. The endorsement stated that the check was cashed *by* Ms. Larsen, *for* Dr. Friedgood. PTO 6; Exhibits ("Exhs.") C, AC.

6. On July 7, 1975, Dr. Friedgood wrote another check for $50,000, this time on the corporate account of CEF Enterprises, Inc., which was also made payable to Dr. Friedgood. Ms. Larsen cashed that check in Denmark, and the endorsement stated that it was cashed for Dr. Friedgood. PTO 7; Exhs. D, AC.

7. On July 8, 1975, Dr. Friedgood wrote a third check—number 267—for $50,000. That check was written on the corporate account of Smallwood Estates Corp., and was also made payable to Dr. Friedgood. It was cashed in Denmark by Ms. Larsen, after being signed by both Ms. Larsen and Dr. Friedgood. PTO 8; Exhs. C, AC.

8. On August 5, 1975, Dr. Friedgood was indicted for murder in the second degree and grand larceny in the second degree. He was accused of killing his wife by injecting her with a lethal dose of Demerol. He was also accused of stealing bonds, securities, jewelry, and United States currency from his wife and her estate. PTO 9; Exh. E.

9. In August 1975, Ms. Larsen wired $155,000 from the Handelsbank in Copenhagen to the account of Austin & Dupont, the law firm handling Dr. Friedgood's defense. The source of those funds was money that Dr. Friedgood had previously transferred to Ms. Larsen. PTO 10; Exhs. I, J, W, AB.

10. Austin & Dupont retained $10,000 for legal fees, and paid the remaining $145,000 to Midland as collateral for Dr.

Friedgood's bail bond. PTO 11; Exhs. G, H, W.

11. In 1976, after a jury trial, Dr. Friedgood was found guilty on both counts of the indictment. PTO 12.

12. On January 21, 1977, he was sentenced to concurrent indeterminate terms of imprisonment of not less than twenty-five years to life imprisonment on the murder conviction and not more than seven years on the grand larceny conviction. The judgment of conviction was affirmed on appeal. *People v. Friedgood*, 63 A.D.2d 972, 406 N.Y.S.2d 695 (2d Dept.1978).

13. On July 9, 1977, the United States made a jeopardy assessment against Dr. Friedgood [4] for unpaid federal income taxes for the years 1961, 1962, 1963 and 1964 in the amount of $675,568.30. On that same date, the United States made a jeopardy assessment against CEF Enterprises, Inc. for unpaid corporate income taxes for the years 1974 and 1975 in the amount of $124,727.65. PTO 14; Exhs. L, M.

## CONCLUSIONS OF LAW

### 1. *Dr. Friedgood's Checks*

It is undisputed that Ms. Larsen sent the money at issue here to Dr. Friedgood's attorneys, and that the money she sent was used as collateral for Dr. Friedgood's bail bond. It is also undisputed that the funds sent by Ms. Larsen were funds that Dr. Friedgood had previously transferred to her. PTO 10; Exhs. I, J, W, AB.

The IRS contends that the money at issue here never belonged to Ms. Larsen, but rather, belonged to Dr. Friedgood, and that Ms. Larsen was merely acting on his behalf in forwarding the money. The Court agrees.

After Dr. Friedgood killed his wife, he attempted to take bonds, stock and jewelry, worth over $600,000, out of the country by airplane. When this attempt failed, he began to transfer large sums of money to Ms. Larsen in Denmark. Between July 3rd and July 8th, Dr. Friedgood sent $150,000 to

---

**4.** In 1973, Dr. Friedgood had pleaded guilty to filing a false and fraudulent income tax return for 1962. He was sentenced to one year and one day of imprisonment and fined $5000. The sentence was suspended and Dr. Friedgood was placed on probation for two years. PTO 1.

Ms. Larsen. The money was sent by check. Exhs. C, D.

Ms. Larsen contends that the money was sent to her and/or her children as a gift. The record, however, does not support this contention. Indeed, there is strong evidence to the contrary. Dr. Friedgood sent three checks, and each of the checks was made payable to *Dr. Friedgood*. Claimant Larsen failed to explain why—if the checks were intended as gifts—they were made out to Dr. Friedgood rather than to her or the children.[5]

The form of the endorsements on the checks also indicate that Ms. Larsen was acting in a fiduciary capacity. Two of the checks were endorsed "for Charles Friedgood", which was followed by Ms. Larsen's signature. The third check was co-signed by Ms. Larsen and Dr. Friedgood. Exhs. C, D, AC. Furthermore, John Palmer testified that when he represented Dr. Friedgood in 1975–76, he believed that Dr. Friedgood had a bank account in Denmark and that Ms. Larsen had a power of attorney over that account to act on Dr. Friedgood's behalf. Tr. 16; Exh. AB.

The record also shows that Ms. Larsen would not wire the money at issue here to Dr. Friedgood's attorneys without his permission to do so. Tr. 12; Exhs. F, H. Thus, it appears that Dr. Friedgood maintained control over the money that he had sent to Denmark. In addition, Dr. Friedgood agreed that part of the money that Ms. Larsen sent would be used to pay his attorneys' fees. Exh. G. Based on Dr. Friedgood's authorization, Dupont & Austin retained $10,000 of the money that was sent. Tr. 12; Exh. H. The fact that Dr. Friedgood could dispose of the money as he wished, without obtaining Ms. Larsen's consent, indicates that the funds were actually his money.[6] Thus, the Court concludes that the interpleaded funds never belonged to Ms. Larsen.

### 2. *Fraudulent Conveyances*

Section 276 of New York's Debtor and Creditor law provides that "[e]very convey-

---

**5.** The Court had adjourned the trial once and had advised Ms. Larsen's attorney that it was highly unlikely that a second adjournment would be granted. This case has been before the Court since 1977, and it has proceeded at a halting pace. Ms. Larsen's answers to interrogatories have been evasive and incomplete despite a court order to provide full answers. *See* Memorandum filed July 10, 1985, 77 Civ. 4621 (CHT). In addition, the trial was originally scheduled for June 24, 1986, and Ms. Larsen was directed to appear for a deposition during the week of June 23rd. Ms. Larsen did not appear.

Approximately one week before the scheduled trial, Ms. Larsen's attorney advised the Court that Ms. Larsen would not appear because she was afraid to fly. No explanation was offered concerning why she had not made arrangements to travel to the United States by ship since she had more than a month's notice of the trial date. The record shows that between 1977 and 1981 Ms. Larsen travelled to New York five times to visit Dr. Friedgood. Exh. W. Thus, she is clearly capable of travelling.

The trial was postponed until July 15, 1986. Ms. Larsen again failed to appear, with the excuse that she could not arrange for someone to substitute for her at work. Court's Exh. 1; Tr. 2. Because the case had been adjourned once, and because the Court found Ms. Larsen's excuses inadequate, the motion to adjourn the trial was denied.

The Court, however, advised Ms. Larsen's attorney that he was entitled to present any evidence or witnesses that he wished to present. Tr. 3–4. Her attorney declined to participate in the proceedings, stating that without Ms. Larsen he could not make out a prima facie case. Tr. 4–5.

The Court, therefore, has based its decision on the documents submitted in evidence, and the testimony of the single witness called by the Government, John Palmer, Dr. Friedgood's former attorney.

**6.** In his deposition, Dr. Friedgood testified that the money was sent to Ms. Larsen as a gift for the children. Exh. S at 6. The Court, however, gives little weight to this testimony. Clearly Dr. Friedgood would rather see the interpleaded fund be given to Ms. Larsen and the children than to the IRS. In addition, Dr. Friedgood previously submitted an affidavit in which he stated, "I am prepared to conclusively show ... at a hearing and/or trial, that the monies involved herein ... are funds that were borrowed by [me] from assorted acquaintances, patients and others believing in [my] innocence." Aff. of Charles Friedgood, sworn to Aug. 21, 1979, ¶ 6. The fact that Friedgood supported the claim of other persons to the interpleaded fund undermines his assertions on behalf of Ms. Larsen's claim.

ance made and every obligation incurred with actual intent ... to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Fraudulent conveyances may be set aside, so that creditors can recover payment. *See Flushing Savings Bank v. Parr*, 81 A.D.2d 655, 438 N.Y.S.2d 374, 376 (2d Dept.), *appeal dismissed*, 54 N.Y.2d 770, 443 N.Y.S.2d 61, 426 N.E.2d 752 (1981). Proof of intent may be inferred from the circumstances surrounding the transfer. *See Farino v. Farino*, 113 Misc.2d 374, 449 N.Y.S.2d 379, 386 (Sup.Ct. 1982); *De West Realty Corp. v. I.R.S.*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976).

■■■ In this case, even if it had been Dr. Friedgood's intention to make a gift to Ms. Larsen or the children, there is evidence to support the Government's claim that the transfers were made with a view to avoiding obligations and creditors in the United States. Exhs. AB; Q at 1894, 1653–56. Dr. Friedgood's attorney, John Palmer, stated in a letter of March 19, 1976 that Dr. Friedgood "was trying to hide his funds" from his attorneys because he owed them money. Exh. AB. In addition, Dr. Friedgood told a number of his family members that the reason he had attempted to take certain assets out of the country was to evade the IRS. Exh. Q at 1894, 1929, 1462, 1633, 1653–56, 1674.[7] Accordingly, the Court concludes that the money transferred by Dr. Friedgood constituted a fraudulent conveyance which can be recovered by his creditors, in this instance by the IRS, under New York law.

### CONCLUSION

For the reasons set forth above, the Court concludes that the funds sent to Denmark by Dr. Friedgood were not outright gifts to Ms. Larsen.[8] Rather, Ms. Larsen was simply holding the money for Dr. Friedgood. Thus, the interpleaded fund is Dr. Friedgood's money, and as such is subject to the tax lien being asserted by the IRS. The Court also concludes that even if Dr. Friedgood intended the money to be an unrestricted gift, it constituted a fraudulent conveyance, so that the IRS is entitled to recover it under New York law.

Accordingly, the Clerk of the Court is hereby directed to pay to the IRS the full amount of the interpleaded fund, together with any interest accrued thereon.

So ordered.

---

7. An examination of the circumstances surrounding Dr. Friedgood's transfer of money to Ms. Larsen also supports the conclusion that Dr. Friedgood was attempting to avoid his creditors. He was under investigation for the murder of his wife, he was on probation for having filed a fraudulent income tax return for 1962, and his youngest children were living with their mother in another country. PTO 1.

8. In light of the Court's findings and conclusions based on the record, it is not necessary to impose sanctions—e.g., taking certain facts to be established—under Fed.R.Civ.P. 37(b)(2)(A), as requested by the IRS.