Solange LANDAU, Plaintiff–Appellant,

v.

Toni VALLEN, Haas Securities Corp., Eugene K. Laff, Stanley Aslanian, Jr., Mark Burgess, L.F. Rothschild & Co., Inc., Robert Schoenthal, Mathew R. Deane, Francois Mayer, Robert R. Errico, Andrew Berger, Joel Miller, Kuhns Brothers, Laidlaw, Inc., f/k/a Laidlaw Adams & Peck, Inc., Walter Baur, Henry Lorin, Henlor Capital, Ltd., Joelle Harris a/k/a Mrs. Joelle Lorin, Enn Kunnapas, Linda Kunnapas, Maureen Steffenson, Dr. Irwin Zandman, Capital Shares, Inc., Lawrence C. Caito, H.

Clinton Pollack, Frank Shannon, Yar-rimup (A Corporation), J.T. Moran & Co., Inc., John T. Moran, Paul R. Miano, Jacques M. de Stadelhofen, Legal Assistant Corporation and John Does I–IX, Defendants,

Frank Shannon, Defendant–Appellee.

LF ROTHSCHILD & CO., INC., Third–Party Plaintiff–Counterclaimant,

v.

Henry LORIN, Frank Shannon & Enn Hants Kunnapas, Third–Party Defendants–Counterclaimants.

No. 727, Docket 89–9014.

United States Court of Appeals, Second Circuit.

Argued Dec. 4, 1989.

Decided Feb. 6, 1990.

Mark J. Astarita, New York City (Gusrae, Kaplan & Bruno, New York City, of counsel), for plaintiff-appellant Solange Landau.

Gilbert S. Edelson, New York City, (Rosenman & Colin, Diane da Cunha, of counsel), for defendant-appellee Frank Shannon.

Before NEWMAN and WINTER, Circuit Judges, and TENNEY, District Judge.*

* The Honorable Charles H. Tenney, of the United States District Court for the Southern District of New York, sitting by designation.

TENNEY, District Judge:

The only issue presented in this expedited appeal is whether the alleged victims of a defendant's criminal conduct may seek to attach bail in a related civil proceeding. We hold that they can.

## BACKGROUND

On April 18, 1989, defendant-appellee Frank Shannon pleaded guilty to making a false statement on a disclosure form in violation of federal securities laws. *See* 15 U.S.C. §§ 78m(d), 78ff (1988); 17 C.F.R. § 240.13d–1 *et seq.* (1989). While Shannon's criminal case was pending, plaintiff-appellant Solange Landau added Shannon as a defendant in this civil action, alleging that Shannon and others conspired to defraud her of millions of dollars. She asserts that the crime to which Shannon pleaded guilty furthered the conspiracy alleged in her complaint. Defendant's bail had initially been set at $10,000,000, of which $3,500,000 was deposited in cash. Bail was later reduced to $350,000 cash, which is still being held by the Clerk of the Court for the Southern District of New York. Those funds represent defendant's only assets in the United States.

While defendant was awaiting sentencing, plaintiff applied for an order to attach his bail funds. She was granted an *ex parte* temporary restraining order enjoining the Clerk from releasing the $350,000. Ultimately, however, the district court denied Landau's motion for a preliminary injunction to continue the same relief because it held that attaching bail would undermine its purposes. *Landau v. Vallen*, 723 F.Supp. 218, 220 (S.D.N.Y.1989). The district court's holding was consistent with several other decisions in which courts have denied attachment. *See, e.g., United States v. Badger*, 711 F.Supp. 1008, 1009 (C.D.Cal.1989); *American Exch. Life Ins. Co. v. Putnicki*, 510 F.Supp. 19, 20–21 (W.D.Tex.1980); *Corporation Co. of Miami v. Mikelis*, 467 F.Supp. 826, 827 (S.D. Fla.1979); *Reed Mkt'g Corp. v. Diversified Mkt'g*, 419 F.Supp. 125, 126 (N.D.Ill.1976). It declined to follow other decisions in which attachment has been permitted.

*See, e.g., Bankers' Mortgage Co. v. McComb*, 60 F.2d 218, 221 (10th Cir.1932); *Bank of Hawaii v. Benchwick*, 249 F.Supp. 74, 81–82 (D.Haw.1966). We have continued the district court's temporary restraining order pending resolution of this collateral appeal, *see Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 329–30 (2d Cir. 1983).

## DISCUSSION

■ We agree with the district court that there may be drawbacks to permitting the attachment of bail. In some cases, it may reduce the incentive to return for trial; in others, it may increase the difficulty of obtaining a bail bond. These are legitimate causes for concern but they do not mandate the broad prohibition on attachment adopted by the district court. More importantly, we believe these problems remain even under its holding. Therefore, at least when the persons seeking attachment are the alleged victims of a defendant's criminal conduct, we hold that they must be given the opportunity to seek attachment of all available assets, including funds posted as bail.

The district court denied plaintiff's application because it believed such action was necessary to address its concerns about the overall purposes of bail. This did not exhaust her options, however, because if plaintiff were prevented from attaching the funds held by the Clerk, her likely next step would be to seek an order directed at defendant himself. *See* N.Y.Civ.Prac.L. & R. 5201(b) (McKinney 1978); *Clarkson Co. v. Shaheen*, 716 F.2d 126, 129–30 (2d Cir. 1983); *ABKCO Indus. v. Apple Films*, 39 N.Y.2d 670, 674, 350 N.E.2d 899, 901, 385 N.Y.S.2d 511, 513 (1976). Given the threat of severe sanctions—including default on the civil claims—this approach could be as effective as a direct restraint on the Clerk. For example, defendant could be ordered not to assign any interest in the bail funds while they were being held by the Clerk, and could be ordered to deposit them in an account specified by the court upon their release. Defendant could

even be directed to redeposit the funds with the Clerk.

Indeed, granting such relief would implicate the very issues that concerned the district court in the application to restrain the Clerk. Therefore, under its approach, courts would have to deny any attachment that might diminish a defendant's expectation in the release of bail. That policy might have to be extended to funds defendants still had in their possession but merely intended to post as bail. Taken to its logical extreme, it would give defendants not only a "safe harbor" while bail funds were in the custody of the court, but also "safe passage" in and out of the court's jurisdiction. That would mean a foreign defendant, such as Shannon, could safely bring assets to and from the United States for deposit as bail, assured that they could not be reached by civil creditors. Those facts are not before us, and we do not intend to imply that we would necessarily adopt such a broad rule for other classes of plaintiffs, but we can think of no other approach that would address all the concerns identified by the district court.[1] In any event, however, we do not believe such a broad ruling would be warranted on the facts of this case.

Nor do we find a prohibition on attachment consistent with New York's law of attachment, which otherwise controls. *See* Fed.R.Civ.P. 64; *Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 193, 61 S.Ct. 513, 517–18, 85 L.Ed. 725 (1941); *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 329–30 (2d Cir.1983). Under New York law, plaintiffs have the right to seek prejudgment attachment of a foreign defendant's assets. *See* N.Y.Civ.Prac.L. & R. § 6201(1) (McKinney 1980). Its nonresident attachment statute allows plaintiffs to obtain jurisdiction and secure, for judgment, funds of persons who might otherwise dispose of assets and leave the jurisdiction. *See ITC Entertainment, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir.1983).[2] We have previously acknowledged these sound purposes, *id.*, and New York's courts have been reluctant to undermine them. *See Elton Leather Corp. v. First General Resources Co.*, 138 A.D.2d 132, 136, 529 N.Y.S.2d 769, 771–72 (1st Dep't 1988), *disagreeing with Brastex*, 702 F.2d at 326; *see also Giorgio Morandi, Inc. v. Texport Corp.*, 697 F.Supp. 777, 778 (S.D.N.Y.1988) (following intermediate New York appellate opinion in *Elton Leather* rather than conflicting Second Circuit decision in *Brastex*). Therefore, absent the most compelling circumstances, which we do not find in this case, we would be reluctant to derogate a right so unequivocally embraced by New York's courts.

In addition, we are not comfortable with the notion of indicted defendants using funds that may be the fruits of their crimes as bail while their alleged victims are denied provisional relief that might otherwise be available to help redress their damages. All things being equal, we believe courts in the civil context should be particularly sensitive to the rights of the victims of crimes when they seek compensation from those accused of inflicting their injuries.

### A. The Effect of Attachment on the Purposes of Bail

We have no doubt that the district court shares our concerns about the victims of

---

1. We note that the equities of unrelated civil claimants in this context are not as compelling as those of the alleged victims of a defendant's crimes, but we do not reach the question of whether persons other than victims are entitled to seek attachment of bail.

2. In very limited circumstances, a defendant in New York may also be subject to arrest in a civil case and be required to post bail as a condition of release. N.Y.Civ.Prac.L. & R. § 5250 (McKinney 1978) (arrest proper when there is reason to believe a judgment debtor is about to remove or hide assets); *see* 6 J. Weinstein, H. Korn & A. Miller, *New York Civil Practice*

¶ 5250.01–05 (1988). Although the procedure is rarely ever employed anymore, *see* N.Y.Civ. Prac.L. & R. § 5250 (practice commentary), any assets posted as bail may ultimately be used to satisfy the judgment. *See, e.g., Chancer v. Chancer*, 308 N.Y. 204, 208, 124 N.E.2d 283, 284 (1954); *Standard Elec. Equip. Corp. v. Laszkowski*, 305 N.Y. 58, 62, 110 N.E.2d 555, 557 (1953); *Steinberg v. Frankel*, 154 Misc. 179, 180, 276 N.Y.S. 694, 694–95 (N.Y.Cty.Ct.1935) (suggesting that bail in criminal cases had historically been available to satisfy civil judgments); *Lichter v. Raff*, 149 Misc. 53, 54–55, 266 N.Y.S. 748, 749–50 (N.Y.Cty.Ct.1933).

crimes. Nevertheless, it identified broader concerns about the impact of attachment on the purposes of bail that it concluded outweighed even victims' rights. We believe it may have placed too much emphasis on these concerns.

While the expectation that bail will be returned is an important consideration, it is only one of the incentives for a defendant to return for trial. Violating the conditions of bail may also create a risk of forcible arrest on a bench warrant, pretrial incarceration, contempt, bail-jumping charges and enhanced punishment at sentencing. For some defendants, these repercussions would outweigh any increased incentive to flee that might be engendered by the potential attachment of bail. For others, the threat of bail forfeiture might be the paramount factor. A blanket rule barring all attachments presumes that every criminal defendant would react similarly to a diminished expectation in the return of bail. In the case before us, the defendant had already been sentenced by the time the district court rendered its decision. Therefore, an attachment could not possibly implicate a risk of flight. *See Bankers' Mortgage Co. v. McComb,* 60 F.2d 218, 221 (10th Cir.1932).[3]

In addition, even in those cases where the threat of loss of bail is the most important factor, attachment would not necessarily decrease the incentive to return for trial. Granting an order of attachment does not mean that bail funds will be turned over to a civil plaintiff. It only ensures that they will remain in the court's jurisdiction pending resolution of the civil lawsuit. Moreover, no defendant can be fully certain that bail will be returned. Some courts have allowed payment of criminal penalties, without consent, from funds deposited as bail. *Bank of Hawaii v. Ben-*

*chwick,* 249 F.Supp. 74, 77 (D.Haw.1966); *United States v. Klein,* 163 F.Supp. 823, 823–24 (S.D.N.Y.1958); *Gilbert v. Laidlaw,* 102 N.Y. 588, 592, 7 N.E. 910, 913 (1886); *see United States v. Davis,* 135 F.2d 1013, 1014 (2d Cir.1943) (Clark, J., dissenting). *But see Cohen v. United States,* 82 S.Ct. 526, 528, 7 L.Ed.2d 518 (1962); *United States v. Powell,* 639 F.2d 224, 225–26 (5th Cir. Unit A Mar.1981). Bail is also subject to confiscation or forfeiture by the Government. *See, e.g., United States v. $250,000 in United States Currency,* 808 F.2d 895, 901 (1st Cir.1987) (upholding forfeiture of bail funds while conviction was being appealed); *Jacobson v. Hahn,* 88 F.2d 433, 435 (2d Cir.1937) (determining validity of IRS lien against bail funds held by the Clerk); *United States v. One Single Family Residence,* 683 F.Supp. 783, 790 (S.D. Fla.1988) (upholding forfeiture of mortgage used to secure bail bond); *Midland Ins. Co. v. Friedgood,* 649 F.Supp. 239, 240 (S.D.N.Y.1986) (awarding, to IRS, funds held by insurance company to secure bail bond); *cf. Kelly v. Springett,* 527 F.2d 1090, 1093 (9th Cir.1975) (affirming seizure and tax assessments on funds intended to be used as bail). The risk that a defendant's bail might also be subject to attachment by civil claimants may further reduce the expectation of return, but only by a matter of degree.

In each of these contexts, the theoretical reduction in the incentive to return for trial is outweighed by other societal objectives. The plaintiff in this case falls within a special class of civil litigants because she allegedly suffered her losses in a scheme serious enough to warrant criminal prosecution. We believe that preserving the full range of provisional remedies for alleged victims, such as this plaintiff, is an important goal that justifies a possible incremen-

---

**3.** The district court's concerns about the impact of attachment on defendants in active criminal cases did not support its *per se* prohibition. If the class of permissible applicants were restricted to the alleged victims of the crime, the judge initially setting bail could evaluate the possible civil exposure and set bail accordingly. We are skeptical that the possible added risk of flight could ever outweigh a plaintiff's right to seek a provisional remedy granted by state law. But,

if it appeared to be a legitimate concern, it is typical of bail issues that are evaluated and addressed on a case-by-case basis. *See, e.g., United States v. Nebbia,* 357 F.2d 303, 305 (2d Cir.1966). We do not believe that an individualized hearing on the risk of flight would be warranted even if the criminal matter were still pending but, in this case, we hold only that when the purposes of bail have been accomplished, the issue is not relevant.

tal reduction in the incentive for defendants in other criminal cases to return for trial. The *per se* rule adopted by the district court would have had the opposite result. This plaintiff, for example, was denied access to attachment, even though the rationale advanced by the district court did not apply to the facts of her case.

■ No criminal defendant should be able to post property as bail without its owner's consent. A thief would not be permitted to use a victim's property, *see Bank of Hawaii,* 249 F.Supp. at 83–84, and we believe the ability to raise bail should not be enhanced by the commission of a crime. The district court noted that plaintiff "assert[ed] no interest in the actual bail money." 723 F.Supp. at 219. "Interest" in this context is a fluid concept, however. Plaintiff alleges that she lost millions of dollars as a result of the criminal conspiracy and that defendant profited from the scheme. Third Amended Complaint ¶¶ 174–75 (Jt.App. 199a). Admittedly, in this type of case, the proceeds of the crime are more difficult to identify than if the crime were a simple theft, but the underlying principle—that they should not be used as bail—remains the same. If plaintiff's allegations are true, then defendant's net worth increased, in part, by the amount of her losses.

Every court considering an application for prejudgment attachment determines a plaintiff's potential interest in property when it examines the likelihood of success on the merits. *See* N.Y.Civ.Prac.L. & R. 6212(a) (McKinney 1980). If plaintiff proves her allegations, then she will certainly acquire an interest in all of defendant's assets, including these funds. Conclusively establishing that interest as a matter of law may take several years. This means that courts may not be able to prevent defendants who have criminally obtained funds from using them to remain at liberty during prosecution. As disturbing as that prospect is, however, we are loath to compound it by helping defendants remove those funds from their victims' reach after the criminal case has ended.

**B. *Legal Actions Involving Funds in the Court's Registry***

■ The district court believed that funds in the custody of the Clerk were generally protected from litigation. We can quickly dispose of defendant's argument on appeal that this type of attachment would be barred by sovereign immunity. Funds deposited in the registry of a court are deemed to be held by the United States Treasury, 28 U.S.C. § 2041 (1982), but a simple order of attachment of funds held by the United States, in which it has absolutely no interest, does not implicate the sovereign immunity doctrine. Plaintiff does not seek to compel the Clerk to remit funds to her, only to preserve the *status quo.* The mere act of ordering the United States to continue its possession is hardly sufficient "restraint" or "compulsion" to warrant application of the doctrine. *See Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 704, 69 S.Ct. 1457, 1468–69, 93 L.Ed. 1628 (1949). No funds in which the United States has an interest will be expended from the Treasury; nor will the relief interfere with the public administration. *See Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009, 1012–13, 91 L.Ed. 1209 (1947). The United States' involvement is only ancillary, and the sovereign immunity doctrine does not apply. *See Excess and Casualty Reinsurance Ass'n v. Insurance Comm'r,* 656 F.2d 491, 497–98 (9th Cir. 1981); *Merritt–Chapman & Scott Corp. v. Public Util. Dist.,* 319 F.2d 94, 109–12, 114 (2d Cir.1963), *cert. denied,* 375 U.S. 968, 84 S.Ct. 488, 11 L.Ed.2d 417 (1964); *Bank of Hawaii,* 249 F.Supp. at 79; *cf. International Mortgage & Investment Corp. v. Von Clemm,* 301 F.2d 857, 863–64 (2d Cir.1962) (United States need not consent to be defended in an action).

The district court nonetheless reasoned that the *custodia legis* doctrine prohibited attachment of funds in the Clerk's custody, but that doctrine is also not applicable to these facts. The *custodia legis* doctrine bars any attachment of funds in a court's registry that would prevent the court from disposing of the funds in accordance with

the purpose for which they were deposited. *See In re Watts and Sachs*, 190 U.S. 1, 30, 23 S.Ct. 718, 725–26, 47 L.Ed. 933 (1903); *The Lottawanna*, 87 U.S. (20 Wall.) 201, 222, 224, 22 L.Ed. 259 (1873); *Bucher v. Vance*, 36 F.2d 774, 775 (7th Cir.1929); *Jones v. Merchants' Nat'l Bank*, 76 F. 683, 684, 687 (1st Cir.1896); *Thomas v. Wooldridge*, 23 F.Cas. 986, 987 (C.C.S.D.Mo. 1875) (No. 13,918) (Bradley, J.); *In re Stark*, 36 F.2d 280, 280 (W.D.N.Y.1929). It is most frequently invoked when the order of one court interferes with the authority of another to dispose of a *res* within its custody. *See, e.g., Straton v. New*, 283 U.S. 318, 321–22, 51 S.Ct. 465, 466–67, 75 L.Ed. 1060 (1931); *Cameron v. United States*, 231 U.S. 710, 717, 34 S.Ct. 244, 246, 58 L.Ed. 448 (1914); *Acme Harvester Co. v. Beekman Lumber Co.*, 222 U.S. 300, 307–08, 32 S.Ct. 96, 99–100, 56 L.Ed. 208 (1911); *In re Watts and Sachs*, 190 U.S. at 35, 23 S.Ct. at 727–28 (applying the doctrine and expressing "regret at the unfortunate collision between the two courts"); *The Lottawanna*, 87 U.S. (20 Wall.) at 214; *Clarkson Co. v. Shaheen*, 716 F.2d 126, 129 (2d Cir.1983); *Tolfree v. New York Title & Mortgage Co.*, 72 F.2d 702, 704 (2d Cir.), *cert. denied*, 293 U.S. 619, 55 S.Ct. 216, 79 L.Ed. 707 (1934); *Bucher*, 36 F.2d at 775 (7th Cir.1929) (refusing to honor state-court attachment, explaining that "[a] bill which can reach no result except by staying the ordinary and rightful exercise of the essential functions of the court ... will not be tolerated") (quoting *Jones*, 76 F. at 687)); *Thomas*, 23 F.Cas. at 987 (applying the doctrine after stating that attempts to attach federal judgments by state courts are "against the dignity of the court," "calculated to excite jealousies" and "produce a collision in the jurisdiction of the courts that would extremely embarrass the administration of justice"); *In re Stark*, 36 F.2d at 280 (holding that money held by a federal court "is not subject to attachment by any other court"). *But cf. Huron Holding Corp. v. Lincoln Mine Operating Co.*, 312 U.S. 183, 192, 61 S.Ct. 513, 517–18, 85 L.Ed. 725 (1941) (there is "no such broad general rule" barring the attachment of state and federal judgments by each other's courts).

The doctrine is often applied in the bankruptcy context to bar the efforts of creditors to obtain preferential status. *See Straton*, 283 U.S. at 321–22, 51 S.Ct. at 465; *Cameron*, 231 U.S. at 717, 34 S.Ct. at 244; *Acme Harvester*, 222 U.S. at 307–08, 32 S.Ct. at 96; *Clarkson*, 716 F.2d at 129; *see also In re Petrusch*, 667 F.2d 297, 300 (2d Cir.1981) ("[c]oncern for the preservation of estates in bankruptcy and prevention from interference in their *status quo* has had a long history and effective remedies bottomed on the concept of *custodia legis*"), *cert. denied*, 456 U.S. 974, 102 S.Ct. 2238, 72 L.Ed.2d 848 (1982). It is also used to preserve the ability of other courts to distribute assets in their custody. For example, under Article 74 of New York's Insurance Law the New York Superintendent of Insurance has exclusive authority to liquidate the assets of insolvent insurance companies. N.Y.Ins. Law § 7428 (McKinney 1985); *see Law Enforcement Ins. Co. v. Corcoran*, 807 F.2d 38, 43 (2d Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987). Accordingly, under both *custodia legis* and abstention rationales, we have, on several occasions, avoided any federal interference with the Superintendent's efforts. *See, e.g., Law Enforcement Ins. Co.*, 807 F.2d at 41–42 (abstaining, noting that courts should do so when "the exercise by one court of its jurisdiction would tend to impede or embarrass the other court in the exercise of its jurisdiction"); *Tolfree*, 72 F.2d at 704 (dismissing lawsuit under *custodia legis* rationale noting "federal courts should not interfere with the possession of the state court"); *see also Corcoran v. Universal Reinsurance Corp.*, 713 F.Supp. 77, 79–80 (S.D.N.Y.1989) (abstaining to avoid "hamper[ing] New York's attempts to create a unified liquidation proceeding, and perhaps encourag[ing] other parties to the liquidation to evade the state proceedings"); *Mathias v. Lennon*, 474 F.Supp. 949, 957 (S.D.N.Y.1979) (abstaining "to avoid conflict with the state's regulatory apparatus"). In each context, the doctrine has been used to prevent one court from interfering with the authority of another.

In *The Lottawanna*, 87 U.S. (20 Wall.) 201, 22 L.Ed. 259 (1873), upon which the district court relied, the Supreme Court invoked the doctrine to address such a concern. In that case, the Court considered the effect of a state-court attachment on funds held in the registry of an admiralty court. *The Lottawanna* arose at a time when admiralty jurisdiction provided significant advantages to a plaintiff. Most important was the right to proceed directly against a vessel *in rem*, an attractive alternative to the vagaries associated with actions prosecuted *in personam*. Proceeding in this manner obviated the need to obtain personal jurisdiction over a defendant, a much more daunting task in 1873 than today. *See, e.g.*, N.Y.Civ.Prac.L. & R. § 302 (McKinney 1972 & Supp.1990) (New York "long-arm" statute). To protect the federal courts' exclusive jurisdiction over admiralty claims, and the powerful rights associated with them, the Supreme Court had previously held in *The Moses Taylor*, 71 U.S. (4 Wall.) 411, 430–31, 18 L.Ed. 397 (1866), and *The Hine v. Trevor*, 71 U.S. (4 Wall.) 555, 569, 18 L.Ed. 451 (1866), that state statutes attempting to confer *in rem* jurisdiction for marine contracts or torts were void.

The admiralty court in *The Lottawanna* had distributed the proceeds from the judicial sale of a vessel to a group of sailors who had been able to assert "maritime" liens—the limited category of liens that provide admiralty jurisdiction. 87 U.S. (20 Wall.) at 213. There was a surplus remaining after the distribution but there were other persons asserting non-maritime claims concerning the vessel. Since they could not establish admiralty jurisdiction, some members of this group obtained state-court, *in personam*, default judgments against the owner of the vessel.

Using their judgments, they then obtained state-court orders of attachment for the surplus remaining in the admiralty court's registry. The owner appeared in the admiralty court and objected to any distribution to the state-court plaintiffs, as did other potential plaintiffs who had not had the foresight to reduce their claims to default judgments. The admiralty court nevertheless proceeded to determine the merits of all the claims and distribute the surplus.

The Supreme Court held that the admiralty court had erred in doing so. Its members were particularly disturbed by the ease with which the state-court plaintiffs had evaded the admiralty court's stringent access requirements.[4] It explained that the admiralty court's jurisdiction did not extend to the non-maritime liens of the state-court plaintiffs, concluding that the only authority the admiralty court had over the surplus funds was the power to release them to the vessel's owner. *Id.* at 221. In addition, the Court found the state-court attachment invalid because it would have required the admiralty court to violate its duty to return the surplus to the vessel's owner. *See id.* at 224. Thus, the state-court attachment interfered with the admiralty court's authority to dispose of a *res* in accordance with the purposes for which it had been deposited.

On its face, however, the Court's brief discussion on this point was quite broad. It stated that the admiralty court could not have considered the state-court attachment "[b]ecause the fund, from its very nature, is not subject to attachment either by the process of foreign attachment or of garnishment." *Id.* at 224 (footnote omitted). It acknowledged elsewhere in its opinion, however, that "[s]upplemental suits in the nature of a suit *in rem* may unquestionably be entertained in favor of parties having *an interest* in the proceeds." *Id.* at

---

4. The Court stated:

> [T]he right of the court to decree that third persons who could not have proceeded against the property *in rem* may recover a proportion of the proceeds to satisfy their claims against the owner, in a case where the owner appears and opposes the application, seems to be repugnant to every sound principle of judicial proceeding, and it is certainly opposed to the great weight of authority.

87 U.S. (20 Wall.) at 224.

223 (emphasis in original).[5] Therefore, the Court did not identify a general rule precluding actions against funds held in the registry; it merely held that the state-court plaintiffs had not asserted an "interest" cognizable in admiralty.

The Lottawanna has been cited in reference to the *custodia legis* doctrine on only a few occasions. *See, e.g., In re Casco Chemical Co.,* 335 F.2d 645, 649 (5th Cir. 1964); *Corporation Co. of Miami v. Mikelis,* 467 F.Supp. 826, 827 (S.D.Fla.1979); *Schmid v. Maxwell,* 228 F.Supp. 105, 110 (N.D.Cal.1964), *aff'd,* 341 F.2d 235 (9th Cir. 1965); *United States v. Klein,* 163 F.Supp. 823, 823–24 (S.D.N.Y.1958); 7 J. Moore, J. Lucas & K. Sinclair, *Moore's Federal Practice* ¶ 67.06 (1989). Nevertheless, its broad language appears to have contributed to confusion over the scope of the doctrine. That it has been cited for the broad proposition that funds in the registry are generally immune from litigation simply confirms that "dicta are not always ticketed as such, and one does not recognize them always at a glance," B. Cardozo, *The Nature of the Judicial Process* 30 (1921). *See Corporation Co.,* 467 F.Supp. at 827 (stating that the Supreme Court had held, in *The Lottawanna,* that funds in the hands of the Clerk are not subject to garnishment); *Moore's Federal Practice, supra,* ¶ 67.06 (stating the funds in a court's registry are not subject to an order of attachment "issuing from another court or even from *the same federal court*") (emphasis added).

 The Clerk's authority to dispose of assets in its registry is dictated by the court it serves. *See Atlantic Trust Co. v. Chapman,* 208 U.S. 360, 371, 28 S.Ct. 406, 409, 52 L.Ed. 528 (1908); *The Lottawanna,* 87 U.S. (20 Wall.) at 225 (funds deposited in the registries of courts may not be withdrawn "except by the order of the judge or judges of said courts"); *Durand & Co. v. Howard & Co.,* 216 F. 585, 588–89 (2d Cir.1914). New York's courts, for example, expressly permit attachment of funds held in *custodia legis. See Clarkson Co. v. Shaheen,* 716 F.2d 126, 129 (2d Cir.1983); *Matter of Leikind,* 22 N.Y.2d 346, 353, 239 N.E.2d 550, 552–54, 292 N.Y.S.2d 681, 686 (1968), *appeal dismissed,* 397 U.S. 148, 90 S.Ct. 990, 25 L.Ed.2d 182 (1970). Even in the federal courts, where no such explicit rule has been articulated, attachment of funds in the registry is permissible with leave of the supervising court. *See Jones v. Merchants' Nat'l Bank,* 76 F. 683, 684, 687 (1st Cir.1896). In this case, the request for attachment was made in the court with custody of the *res.* Accordingly, the *custodia legis* doctrine, standing alone, did not preclude attachment.

Defendant's argument that permitting attachment will cause the Clerk to be subject to unprecedented litigation overlooks many reported decisions in which Clerks of the Court, and other persons acting in the role of the Clerk, have been subject to litigation over the disposition of bail. *See, e.g., United States v. $250,000 in United States Currency,* 808 F.2d 895, 901 (1st Cir.1987); *Jacobson v. Hahn,* 88 F.2d 433, 434 (2d Cir.1937); *United States v. One Single Family Residence,* 683 F.Supp. 783, 790 (S.D.Fla.1988); *Midland Ins. Co. v. Friedgood,* 649 F.Supp. 239, 240 (S.D.N.Y. 1986); *United States v. Klein,* 163 F.Supp. 823, 823–24 (S.D.N.Y.1958) (ordering Clerk to hold bail funds in the court's registry pending determination of IRS jeopardy assessment).

In *Jacobson v. Hahn,* 14 F.Supp. 339 (N.D.N.Y.1936), *modified,* 88 F.2d 433 (2d Cir.1937), for example, the Internal Revenue Service had filed a notice of lien against Liberty bonds posted as bail by the attorney for the gangster, Dutch Schultz. Schultz was acquitted after trial and his attorney, claiming ownership of the bonds, filed an action seeking their release. In contrast to the simple order in this case— which restrained the Clerk from taking any

---

**5.** It also stated: "[I]t is presumed that no proceeding to attach such a fund by a creditor of the owner has ever been sustained." 87 U.S. (20 Wall.) at 225 (footnote omitted). Nevertheless, considering the language quoted in the text above, the Court must have been referring to creditors who could not otherwise obtain admiralty jurisdiction.

further action—the Clerk in *Jacobson* was actually named as a defendant and the district court did not resolve the issue until after a full trial. *Id.* at 343; *see also Gilbert v. Laidlaw*, 102 N.Y. 588, 592, 7 N.E. 910, 913 (1886) (reviewing writ of mandamus addressed to county treasurer commanding him to return bail to defendant rather than using it to satisfy criminal fine). This court reviewed the evidence and reached a contrary conclusion about who should receive the bonds but never questioned the propriety of the lawsuit itself. 88 F.2d at 435.

By reaffirming the basic premise of cases such as *Jacobson*, we merely acknowledge that the door to attachment of bail has always been open. That more plaintiffs may elect to avail themselves of the remedy is no reason to abolish it. Moreover, we do not think that the Clerk's mere filing of a simple interpleader, which could be reduced to a form, would seriously impede its other functions. *See, e.g., Schmid*, 228 F.Supp. at 111.

## CONCLUSION

Civil plaintiffs who can articulate a reasonable nexus between their losses and the crimes alleged in an accusatory instrument are entitled to seek attachment of assets posted as bail by a defendant.[6] In light of our conclusion that plaintiff's application was not barred by a general policy, we reverse and remand the case to the district court to consider the merits of plaintiff's substantive claims, to the extent normally appropriate to determine entitlement to an attachment. The continuation of the district court's temporary restraining order shall remain in effect until ten days after the mandate issues.

---

6. This application was made in the district where the bail is being held. Therefore, we do not address what general power, if any, a district court has to order attachment of funds held in the registry of another. In addition, defendant has been sentenced and has not appealed his conviction, so the purposes of bail in this case have undeniably been accomplished. In

other cases with less compelling facts, however, it might be beneficial to have the Government's input on the issue. *See, e.g., Bankers' Mortgage Co. v. McComb*, 60 F.2d 218, 221 (10th Cir.1932). Accordingly, applications to attach bail in such cases should probably be made with notice to the Government.